STATE of Wisconsin, Plaintiff-Respondent,

v.

Frederick G. JACKSON, Defendant-Appellant.†

Court of Appeals

*No. 98–0525–CR. Submitted on briefs May 11, 1999.—Decided July 13, 1999.*

(Also reported in 600 N.W.2d 39.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Allan D. Krezminski* of the *Law Office of Allan D. Krezminski*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *David J. Becker*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

FINE, J.  Frederick G. Jackson appeals from a judgment, entered on his guilty plea, convicting him of conspiracy to possess cocaine with intent to deliver, as a second or subsequent offense, *see* §§ 961.41(1x), 961.16(2)(b)1, 961.41(1m)(cm)1, & 961.48, STATS., and from the trial court's order denying his motion for post-conviction relief. He claims that the trial court should have ruled inadmissible the test results of a sample of his urine that was taken by hospital personnel, and that the trial court should have suppressed what he told a police officer. He also contends that he was deprived of his constitutional right to effective assistance of counsel. We affirm.

## I.

On May 29, 1997, Milwaukee police officers were investigating a report they had received complaining about gunshots when they saw Jackson driving fast on a Milwaukee street. It was around 10:30 p.m. They stopped Jackson. According to the testimony of one of

the arresting officers at the preliminary examination, Jackson had "some white substance" that looked like cocaine "[a]ll over his mouth and teeth." When one of the officers asked Jackson what was in his mouth, he fled.

Jackson was ultimately stopped and arrested. The officers called an ambulance, which took Jackson to a hospital, where his urine sample was collected and analyzed. The record does not reveal the official results of the urine test but, apparently, it showed that he had cocaine in his system. Although arrested on May 29, Jackson was not given a probable-cause hearing until June 5, 1997.

On June 2, 1997, Jackson was interviewed by a Milwaukee police detective. As the detective gave Jackson the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), Jackson asked if the detective could arrange for him to see a lawyer. The detective testified:

> I told him I could not do that, and that I was going to end my interview with him. He stated he wanted to talk to me now. I stated that he would have to waive his right to an attorney and he would have to be very clear about that which he stated yes, he did want to do that because he wanted to cooperate in giving a statement and answering my questions.

According to the detective, Jackson "initiated then by saying that he wanted to talk to me, and he was very, very persistent about that, and I simply told him I couldn't because he wanted a lawyer, and he continued with that, and I told him the only way this would take place is by him waiving that right to me verbally, stating that he no longer wanted the lawyer and then I could proceed." Jackson then waived his right to an

attorney. Jackson told the detective about his involvement in a cocaine transaction.

On cross-examination, the detective testified that in giving Jackson his *Miranda* warnings, he told him that the lawyer would be appointed for him "once charges were established" and that then "the Public Defender's Office would step in for his defense."

Jackson testified at the suppression hearing that when he asked for a lawyer the detective told him:

> [I]t would look good that you're not a hardened criminal if you would proceed to make a statement without the lawyer, because at that point what he was saying to me, that, you know, if I was really going to come clean like that why am I hiding behind the attorney. That was the general impression that I get, and I wanted the attorney because I didn't want to believe it.

Jackson retreated from this assertion, however, in the following exchange during his cross-examination by the assistant district attorney:

> Q   He [the detective] never said: Well, if you're not a hardened criminal you wouldn't be saying it [asking for a lawyer], did he?
>
> A   He didn't say it in that direct term, no.

Jackson also admitted that he never told the detective that he would not answer any more questions, and that the detective did not physically force him to answer his questions.

The trial court found that the warnings required by the *Miranda* decision "were given and they were complied with." The trial court also found that, based in part on Jackson's extensive prior experience with the criminal justice system and its perception that

Jackson was "a fairly intelligent" person, Jackson made a "knowing and intelligent waiver" of his rights under the *Miranda* decision.

## II.

Jackson makes three arguments in support of his bid for vacatur of his guilty plea. First, he claims that the trial court should have ruled inadmissible the results of the urine test that was done at the hospital. Second, he argues that the trial court should have suppressed his statement to the detective. Third, he contends that his lawyer was ineffective for failing to raise and litigate an alleged violation of *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). We analyze *de novo* legal issues, including questions of constitutional fact, raised by Jackson's contentions. *See State v. Williams*, 220 Wis. 2d 458, 464, 583 N.W.2d 845, 847 (Ct. App. 1998). On the other hand, the trial court's findings of historical fact are given great deference and will not be overturned unless they are "clearly erroneous." *See* RULE 805.17(2), STATS. (made applicable to criminal proceedings by § 972.11(1), STATS.); *Williams*, 220 Wis. 2d at 464, 583 N.W.2d at 847.

### A. *Urine test.*

Jackson's first claim of error is that the trial court should have excluded the results of the hospital urinalysis. We assume, without deciding, that his appeal on this point is permitted by § 971.31(10), STATS. (A defendant may appeal from an order denying a motion to suppress evidence or a motion challenging the admissi-

bility of the defendant's statement even though the judgment of conviction rests on a guilty plea.).[1]

Jackson conceded before the trial court, and also concedes here, that there is no Fourth Amendment issue if hospital personnel took the urine sample without being directed to do so by the police. He also conceded before the trial court that this is what happened. Jackson's trial lawyer explained to the trial court that he filed his motion to suppress the results of the urine test because he "assumed, and I guess wrongly, that the urine was forcibly seized at the direction of the police," and that one of the officers told him "that they didn't ask or direct the seizure of anything." Nevertheless, Jackson faults the trial court for not holding an evidentiary hearing on the issue, and argues in his appellate brief that "[s]ince the state offered no evidence as to how the urine sample was obtained, the trial court should have ruled in favor of Jackson." This has it all wrong.

---

[1] Jackson's lawyer told the trial court that in light of his concession that the Fourth Amendment was not implicated by the taking and analysis of Jackson's urine, he "was not asking it to be suppressed. I'm asking that it be excluded by the physician patient privilege or in the larger sense, it has no relevance here. The State, nobody ever charges someone with possession simply based on the substance being in one's body." Thus, the urinalysis issue may not survive Jackson's guilty plea. *See State v. Nelson*, 108 Wis. 2d 698, 702, 324 N.W.2d 292, 294–295 (Ct. App. 1982) (section 971.31(10), STATS., does not apply to mere evidentiary rulings). In light of our view that Jackson abandoned his motion to exclude the results of the analysis of his urine, however, we do not decide this issue. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

Although the State has the ultimate burden of proof on suppression issues, *see State v. Taylor*, 60 Wis. 2d 506, 519, 210 N.W.2d 873, 880 (1973), the defendant has the burden of production and must produce some evidence that makes a *prima facie* showing that the State violated one of his rights, *see Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."); *United States v. de la Fuente*, 548 F.2d 528, 533–534 (5th Cir. 1977) (defendant has initial burden to show that government acted illegally), *cert. denied*, 431 U.S. 932, 434 U.S. 954. On evidentiary issues, Jackson, like any litigant, has the burden of establishing the applicability of an evidentiary privilege. *See Franzen v. Children's Hosp. of Wis., Inc.*, 169 Wis. 2d 366, 388 n.41, 485 N.W.2d 603, 611 n.41 (Ct. App. 1992) (party asserting privilege has burden of proof on that issue); *United States v. Wilson*, 798 F.2d 509, 512 (1st Cir. 1986) (party asserting privilege has burden of proof on that issue); *see also United States v. Cuozzo*, 962 F.2d 945, 949 (9th Cir. 1992) (burden on defendant to move to strike inadmissible evidence), *cert. denied*, 506 U.S. 978.

■

Jackson did not pursue, beyond a passing reference, his alternate theory that the urinalysis and its subsequent disclosure to the State violated his physician/patient privilege. Indeed, Jackson concedes in his brief on this appeal that "the record [is] devoid of any evidence concerning how the urine sample was obtained from" him. By acquiescing in the officer's representation, and by not either producing evidence or making an offer of proof to the contrary, and by also not

proffering either evidence or an offer of proof on the patient/physician privilege issue, Jackson abandoned his motion to exclude the results of the urinalysis. *See State v. Woods*, 144 Wis. 2d 710, 716, 424 N.W.2d 730, 732 (Ct. App. 1988) (motion made but not pursued is abandoned). A party must do more than simply toss a bunch of concepts into the air with the hope that either the trial court or the opposing party will arrange them into viable and fact-supported legal theories. Jackson's first claim of trial-court error is without merit.

B. *Miranda rights.*

*Edwards v. Arizona,* 451 U.S. 477 (1981), declared that when a person in custody tells an interrogating officer that the person wants a lawyer, that person "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*, 451 U.S. at 484–485. However, "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one," and that if "the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel." *Duckworth v. Eagan*, 492 U.S. 195, 204 (1989). This is precisely what the trial court found happened here. Jackson's argument that he was somehow misled into giving up his *Miranda* rights because the detective told him that he would be given a public-defender lawyer "once charges were established" is without merit.

Although defendants can, of course, have access to lawyers *before* charges are formally lodged, the detective's inaccurate assertion was not a violation of the *Miranda* prophylactic rule; *Duckworth* recognized that in the real world, rigid, verbatim adherence to ideal *Miranda* warnings is not required:

> We have never insisted that *Miranda* warnings be given in the exact form described in that decision. In *Miranda* itself, the Court said that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*," prerequisites to the admissibility of any statement made by a defendant.
>
> . . . Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "convey[y] to [a suspect] his rights as required by *Miranda*."

*Duckworth*, 492 U.S. at 202–203 (footnote and quoted sources omitted; bracketing by *Duckworth*). Thus, *Duckworth* held that a police officer's advice to a suspect undergoing custodial interrogation that he would get a lawyer "if and when you go to court" passed *Miranda* muster, and that his confessions could be used against him. *See Duckworth*, 492 U.S. at 197, 198, 204–205. This was also the rule in Wisconsin prior to *Duckworth*. *See Jones v. State*, 69 Wis. 2d 337, 342–345, 230 N.W.2d 677, 681–683 (1975) (cited with approval in *Duckworth*, 492 U.S. at 201 n.2); *see also State v. Schindler*, 146 Wis. 2d 47, 49–51, 429 N.W.2d 110, 111–112 (Ct. App. 1988) (" 'If you cannot afford a lawyer, the public defender's office will determine

whether one will be appointed for you,' " did not violate *Miranda*.).

The dissent argues that the detective misinformed Jackson as to whether the detective could have left Jackson alone and called the public defender's office to get an emergency appointment of a lawyer for Jackson. Assuming that to be true, there is neither evidence nor an offer of proof in the record that the detective *knew* he could have both left Jackson alone to make the call and gotten the public defender's office to implement its emergency-appointment procedures. We will not circumvent *Duckworth* merely because a police officer makes an inadvertent comment that later detailed analysis indicates may have been mistaken.[2] Moreo-

---

[2] Indeed, although, as the dissent points out, the police officer in *Duckworth v. Eagan*, 492 U.S. 195 (1989), described accurately the state-law procedure in that case, *see id.*, 492 U.S. at 204, *Duckworth* was based on a more fundamental principle: namely, that all a person in custody need be told is that he or she does not have to talk to the police until that person has a lawyer. The dissent in *Duckworth*, written by the same justice who wrote *Frazier v. Cupp*, 394 U.S. 731 (1969), makes this clear:

> That the warning given to Eagan "accurately described the procedure for the appointment of counsel in Indiana," ante, at 204, does nothing to mitigate the possibility that he would feel coerced into talking to the police. *Miranda*, it is true, does not require the police to have a "station house lawyer" ready at all times to counsel suspects taken into custody. 384 U.S., at 474. But if a suspect does not understand that a lawyer will be made available within a reasonable period of time after he has been taken into custody and advised of his rights, the suspect may decide to talk to the police *for that reason alone*. The threat of an indefinite deferral of interrogation, in a system like Indiana's, thus constitutes an effective means by which the police can pressure a suspect to speak without the presence of counsel. Sanctioning such police practices simply because the warnings given do not misrepresent state law does

ver, even deliberate misstatements by the police comprise but one factor in determining whether a defendant has voluntarily relinquished the right not to undergo custodial interrogation. *See Frazier v. Cupp*, 394 U.S. 731, 737–739 (1969); *State v. Woods*, 117 Wis. 2d 701, 724–728, 345 N.W.2d 457, 469–471 (1984), *habeas corpus granted sub nom. Woods v. Clusen*, 605 F. Supp. 890 (E.D. Wis. 1985) (*Frazier* not discussed), *aff'd*, 794 F.2d 293 (7th Cir. 1986) (*Frazier* not discussed); *State v. Fehrenbach*, 118 Wis. 2d 65, 66–67, 347 N.W.2d 379, 380 (Ct. App. 1984). There is nothing in the appellate record here that indicates that a lawyer would have appeared in time for the interrogation if the detective had done what the dissent faults him for not doing. Most significant, however, is that the detective told Jackson that he would not talk to Jackson because Jackson wanted a lawyer. The detective told Jackson that Jackson would get a lawyer later. Jackson did not want to wait. Under the law, that was Jackson's choice. There is nothing in the record that even hints that Jackson's ability to make a free and rational choice not to wait was impaired by what the detective told him. The trial court did not err in refusing to suppress Jackson's statement to the detective.

### C. *Alleged ineffective assistance of counsel.*

Although not stated specifically, Jackson's claim that he was denied effective assistance of counsel underpins his desire to withdraw his guilty plea. A

---

nothing more than let the state-law tail wag the federal constitutional dog.

*Duckworth*, 492 U.S. at 218 (Marshall, J. dissenting) (emphasis in original). The dissent in *Duckworth* reads much like the dissent here, but, of course, a dissent is what the law is not.

defendant who seeks to withdraw a guilty plea after sentence has been imposed "carries the heavy burden of establishing, by clear and convincing evidence," that withdrawal of the plea is necessary "to correct a 'manifest injustice.' " *State v. Washington*, 176 Wis. 2d 205, 213, 500 N.W.2d 331, 335 (Ct. App. 1993) (quoted source omitted). "[T]he 'manifest injustice' test is met if the defendant was denied the effective assistance of counsel." *State v. Bentley*, 201 Wis. 2d 303, 311, 548 N.W.2d 50, 54 (1996).

*County of Riverside* requires that, as a "general matter," persons not arrested on warrants have a probable-cause hearing within forty-eight hours of arrest. 500 U.S. at 56. As noted, although Jackson was arrested on the night of May 29, 1997, he was not arraigned until June 5, 1997. On its surface, this appears to be a violation of *County of Riverside*, inasmuch as there is nothing in the record that indicates how long and for what reason Jackson was kept at the hospital. We do know, however, that a Milwaukee police detective interviewed Jackson at Milwaukee's Criminal Justice Facility on the morning of June 2, 1997. Thus, Jackson was out of the hospital at least by then, and his arraignment was thus after the forty-eight-hour period expired—even assuming, but not deciding, that the forty-eight-hour period was tolled during Jackson's hospitalization. We will also assume for the purposes of this opinion that Jackson's interrogation by the police detective was outside the forty-eight-hour parameters established by *County of Riverside*. Accordingly, we turn to whether the failure of Jackson's lawyer to seek to suppress Jackson's statement to the police detective on *County of Riverside* grounds was ineffective assistance in violation of the United States and Wisconsin constitutions.

341

Every criminal defendant has a Sixth Amendment right to the effective assistance of counsel, *see Strickland v. Washington*, 466 U.S. 668, 686 (1984), and a coterminous right under Article I, § 7 of the Wisconsin Constitution, *see State v. Sanchez*, 201 Wis. 2d 219, 226–236, 548 N.W.2d 69, 72–76 (1996). In order to establish a violation of this right, a defendant must prove two things: (1) that his or her lawyer's performance was deficient; and, if so, (2) that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687; *see also Sanchez*, 201 Wis. 2d at 236, 548 N.W.2d at 76.

A lawyer's performance is not deficient unless he or she "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The defendant must also prove prejudice; that is, he or she must demonstrate that the trial lawyer's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Ibid.* Put another way: "In order to show prejudice, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Sanchez*, 201 Wis. 2d at 236, 548 N.W.2d at 76 (bracketing by *Sanchez* ) (quoting *Strickland*, 466 U.S. at 694).

In assessing a defendant's claim that his or her counsel was ineffective, a court need not address both the deficient-performance and prejudice components if the defendant does not make a sufficient showing on one. *See Strickland*, 466 U.S. at 697; *Sanchez*, 201 Wis.

2d at 236, 548 N.W.2d at 76. Moreover, a defendant is not entitled to an evidentiary hearing on an ineffective-assistance-of-counsel claim unless he or she " 'alleges facts which, if true, would entitle the defendant to relief.' " *Bentley*, 201 Wis. 2d at 309, 548 N.W.2d at 53. This presents a question of law that we review *de novo*. *See id.*, 201 Wis. 2d at 310, 548 N.W.2d at 53. *Bentley* reiterated the criteria that a defendant who claims that he or she would not have pled guilty but for a lawyer's deficient performance must satisfy in order to make a *prima facie* showing of prejudice:

> This court has long held that the facts supporting plea withdrawal must be alleged in the petition and the defendant cannot rely on conclusory allegations, hoping to supplement them at a hearing. A defendant must do more than merely allege that he would have pled differently; such an allegation must be supported by objective factual assertions.
>
> While Wisconsin courts have long held that conclusory allegations without factual support are insufficient, they have not specifically discussed the type of facts necessary to warrant a hearing. The nature and specificity of the required supporting facts will necessarily differ from case to case. However, a defendant should provide facts that allow the reviewing court to meaningfully assess his or her claim.

*Id.*, 201 Wis. 2d at 313–314, 548 N.W.2d at 54–55 (internal citations and footnote omitted). Mere self-serving conclusions will not suffice. *See id.*, 201 Wis. 2d at 316, 548 N.W.2d at 56. Rather, the defendant "must also allege facts which allow the court to meaningfully assess his claim of prejudice." *Id.*, 201 Wis. 2d at 318, 548 N.W.2d at 57.

■Jackson's motion is bereft of *any* allegation, no less any factual support for any such allegation, that he would not have pled guilty if his lawyer had sought to suppress his statement to the detective because of an alleged violation of the *County of Riverside* decision.[3] Moreover, he has not made any offer of proof to support a conclusion that such a motion would have been successful. *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986) (defendant who alleges that counsel was ineffective for withdrawing a suppression motion must show that the motion would have succeeded). Accordingly, the trial court was not required to hold an evidentiary hearing on his claim. *See Bentley,* 201 Wis. 2d at 309–310, 548 N.W.2d at 53. Nevertheless, the trial court could have, within the proper exercise of its discretion, held an evidentiary hearing even though such a hearing was not required. *See ibid.*

---

[3] Jackson's postconviction motion in connection with the alleged violation of *County of Riverside v. McLaughlin,* 500 U.S. 44 (1991), and his assertion that his trial lawyer was deficient in failing to seek suppression of Jackson's statement to the detective as a result, read as follows:

3. Defendant also moves the court for a hearing on whether a probable cause determination was made within 48 hours of the defendant being arrested and taken into custody on May 29, 1997 pursuant to the holding of *County of Riverside v. McLaughlin,* 500 U.S. 44 (1991) and, if not, whether the statement taken on June 2, 1997 was inadmissible because it was the fruit of a *Riverside* violation, on the ground that the court record in this action shows that a probable cause determination was not made until June 5, 1997, seven (7) days after defendant's arrest.

4. Alternatively, Defendant moves the court for a hearing on whether Defendant's trial counsel rendered ineffective assistance of counsel for not raising and/or presenting the court with the above issues, arguments and evidence.

A trial court "properly exercises its discretion when it has examined the relevant facts, applied the proper legal standards, and engaged in a rational decision-making process." *Id.*, 201 Wis. 2d at 318, 548 N.W.2d at 57. In its written decision denying Jackson's postconviction motion, the trial court noted that "there was no indication that the delay caused defendant to give a statement to police officers." A *County of Riverside* violation, without more, does not entitle a defendant to suppress any statement the defendant might have made during the period of unlawful delay, absent a showing that the statement was produced as a result of the delay. *See State v. Koch*, 175 Wis. 2d 684, 699–700, 499 N.W.2d 152, 160 (1993). The trial court's decision was, therefore, consistent with "proper legal standards," and was, therefore, well within the ambit of its discretion.

*By the Court.*—Judgment and order affirmed.

SCHUDSON, J. *(concurring in part; dissenting in part)*. I agree with the majority's resolution of Jackson's challenge to the admissibility of the urine sample test results. I disagree, however, with the majority's decision upholding the trial court's denial of Jackson's motion to suppress his confession.[1]

Jackson's appeal presents a narrow issue of great significance: whether a person in custody, who initially

---

[1] Further, as explained in footnote three, because of what Jackson alleges to be a connection between the alleged violation under *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), and his confession, I also depart from the majority's analysis of Jackson's claim that counsel was ineffective for failing to challenge the *Riverside* violation.

invokes the right to counsel, *voluntarily* waives counsel by resuming communication with police and explicitly waiving counsel, when the resumption and waiver are based on *inaccurate* information from police regarding the availability of counsel. I conclude that, under such circumstances, the right to counsel has not been "scrupulously honored" as required under *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

The majority opinion neglects to include the critical portion of the *Miranda-Goodchild* hearing that is central to Jackson's claim. Responding to the prosecutor's questions, Milwaukee Police Detective James Guzinski, who "interrogated [Jackson] as to the extent and nature of his arrest," testified:

> Q: Describe what conversation took place in regards to his constitutional rights.
>
> A: I had given him the standard Miranda warning; and, after so doing, *he asked if I could arrange to have a lawyer. At that point I told him I could not do that*, and that I was going to end my interview with him. He stated he wanted to talk to me now. I stated that he would have to waive his right to an attorney and he would have to be very clear about that which he stated yes, he did want to do that because he wanted to cooperate in giving a statement and answering my questions.
>
> Q: When he told you that—asked you if you could get him a lawyer, did he at any time say he did not want to make a statement to you?
>
> A: No, on the contrary, he actually wanted to give me a statement then, *but his indication was he did not want to see himself get into any further trouble as a result of this and only wanted to have a lawyer by him for such constitutional purposes.*

(Emphases added.) Under cross examination, Detective Guzinski further testified:

Q:   Detective, I want to try to understand the exact sequence. After you read him his rights and asked him if he wanted to make a statement, what exact words do you recall him speaking to you?

A:   *He asked me if he could have a lawyer right now.*

Q:   Is that basically what he said?

A:   *Those words exactly at this point in time, but what he wanted was me to obtain a lawyer right now.*

Q:   Do you agree with the wording on your report, ["H]e then asked me if I could get him a lawyer[."]?

A:   That may very well have been. I wrote that right after that occurred.

Q:   Was your sense of that whether you personally could get him a lawyer—you were physically able to go and summon a lawyer for him, or was he asking that someone bring him a lawyer?

A:   *His intent to me was to have a lawyer present there, then and there, right now, and if I could arrange for that.*

Q:   *And you said no, I can't, basically?*

A:   *That's correct.*

Q:   Okay. And then you went on to talk about when charges were issued a Public Defender would be assigned, is that true?

A:   I explained to him how the process would work with—a lawyer would be given to him as per the Public Defender's Office.

347

Q: Okay. Could you as a matter of actual fact have gotten on the phone at that moment and tried to summon an attorney from the Public Defender's or somewhere else?

A: No.

Q: Why not?

A: I had no phone. I'm in a locked room. I have no access to any of these things.

Q: You were at the Criminal Justice Facility?

A: That is correct.

Q: And you had no access to a phone to call anyone?

A: I had no access to leave the room.

Q: *You had no way to get him a lawyer at that point?*

A: *No.*

Q: In your mind the words you said about having a Public Defender appointed once the District Attorney decided on charges, did you give Mr. Jackson any time[ ]frame in which that would happen?

A: As to minutes and hours?

Q: Or days.

A: I told him that the case would be reviewed and then when that—once charges were established the Public Defender's Office would step in for his defense.

Q: And then Mr. Jackson replied to that statement that he would feel better having an attorney. Those are the words in your report. Are those correct words?

A: You are reading my report, I'm not.

(Emphases added.)

Jackson's testimony essentially confirmed Detective Guzinski's account. On direct examination, Jackson testified:

Q: And after reciting your Miranda rights to you, were you asked by Detective Guzinski if you were willing to answer questions?

A: Yes.

Q: And what was—as you recall, your exact response?

A: I told the detective that I wanted to speak to him *but I would want—wouldn't want to get myself into any further trouble so I would like to have an attorney present.*

Q: And what was the officer—the detective's response to that?

A: The officer said—the detective said to me that if I should respond to him without a lawyer, that it would show I'm not a hardened criminal and it would look good for the D.A.[ ]

Q: And how did you respond to that?

A: On that note we commenced speaking. He decided to ask me some questions, and I remember *I asked him again could I get a lawyer, and he said well, not right then,* and the interview continued.

Q: Did you ask him if he personally would get you a lawyer?

A: I didn't really ask the question could I be accommodated with a lawyer.

Q: And did you at another point make a statement that you would feel better having a lawyer with you?

A: Yes, I did.

Q: And at what point did the detective tell you or make this reference to you—not appearing to be a hardened criminal if you spoke with him without an attorney present?

A: This happened during the course of, you know, my insisting that I wanted an attorney and he trying to show me the benefit. Because I remember feeling that *I wanted to cooperate, and that was essentially what I wanted to do with the protection of · the lawyer.*

So I continued to tell him that, that *I wanted to help the process but I wanted the attorney.* And it was like we were arguing back and forth at that point, and he said: Well, Mr. Jackson, the D.A. is in the process of preparing charges. And I'm saying something is—generally to the effect that, you know, it would look good that you're not a hardened criminal if you would proceed to make a statement without the lawyer, because at that point what he was saying to me, that, you know, if I was really going to come clean like that why am I hiding behind the attorney. That was the general impression that I get, and *I wanted the attorney* because I didn't want to believe it.

(Emphases added.) On cross-examination, Jackson further testified:

Q: So it didn't really surprise you when Detective Guzinski told you you couldn't have a lawyer right then, it would be later on that the Public Defender would appoint one, is that correct?

A: *No. I expected to get a lawyer before we proceeded at that point.*

(Emphases added.)

Jackson argues that his confession was involuntary because his waiver of his right to an attorney was based on inaccurate information received from Detective Guzinski—that an attorney could not be provided at the interrogation. The State first responds with two frivolous arguments: first, that Jackson's invocation of his right to counsel was insufficiently clear; and second, that Jackson's counsel ultimately withdrew the motion to suppress by, in effect, acquiescing to the trial court's refusal to suppress the statement. The record provides no support for either argument and, quite appropriately, the majority relies on neither theory.

The State next offers a more substantial response: that Jackson's resumption of communication and waiver of counsel trumped his earlier invocation of his right to counsel. The State would be correct but for the complicating factor: Jackson's decision to resume the interview without counsel was based, at least in part, on the inaccurate information he received from Detective Guzinski about whether counsel could be provided at the interrogation.

As the State explains, in *Duckworth v. Eagan*, 492 U.S. 195 (1989), the Supreme Court concluded that an officer's advice "that a lawyer would be appointed 'if and when you go to court' " did not undermine the protection of a defendant's right to counsel because "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed . . . that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." *Duckworth*, 492 U.S. at 197, 204. Indeed, as *Duckworth* went on to explain, "*Miranda* emphasized that it was not suggesting that 'each police station must have a "station house lawyer" present at all times to advise prisoners.' " *Id.* at 204.

And, as the majority points out, *Duckworth* explains that "if 'the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel.' " Majority at 337 (quoting *Duckworth*, 492 U.S. at 204).

But there's the rub: "*if* the police cannot provide appointed counsel." And, in *Duckworth*, under the law of Indiana, the police could not do so. *See Duckworth*, 492 U.S. at 204 ("[T]his [*Miranda* warning] instruction accurately described the procedure for the appointment of counsel in Indiana."). In Wisconsin, however, the police could have provided Jackson with a lawyer. *See* § 977.05(6)(c), STATS. (specifying the circumstances under which "[t]he state public defender may not provide legal services or assign counsel for an adult in a criminal case"); *see also* WIS. ADM. CODE §§ PD 2.01(1) (defining " '[e]mergency assignment' " as "assignment of counsel outside of normal business hours or when regular assignment will not provide both effective and early representation"); PD 2.02(1) (regarding "[e]mergency assignment procedure" and requiring evaluation "for indigency as soon as possible"); PD 2.03(1–4) (regarding the "[r]egular assignment procedure" including that for assignment of counsel "to any individual held in custody").

Under *Miranda*, a police warning must "*clearly infor[m]*" a suspect in custody "that if he cannot afford an attorney one will be appointed for him *prior to any questioning* if he so desires." *Miranda*, 384 U.S. at 471, 479 (emphases added). Under *Edwards v. Arizona*, 451 U.S. 477 (1981), "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities *until counsel has been made available to him*, unless the accused himself initiates further communication,

exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85 (emphasis added). Moreover, as the Supreme Court explained:

> [I]f a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.

*Arizona v. Roberson*, 486 U.S. 675, 681 (1988). *See also Michigan v. Harvey*, 494 U.S. 344, 345 (1990) ("[O]nce a criminal defendant invokes his Sixth Amendment right to counsel, a subsequent waiver of that right—even if voluntary, knowing, and intelligent under traditional standards—is presumed invalid if secured pursuant to police-initiated conversation.").

Clearly, Jackson invoked his right to counsel. Clearly, according to both Jackson's and Detective Guzinski's testimony, Jackson did so precisely because he believed that he was, in the Supreme Court's words, "not capable of undergoing such questioning without advice of counsel." *See Roberson*, 486 U.S. at 681. Clearly, Jackson was misinformed about whether, *at the interrogation*, counsel could be "made available to him." *See Edwards*, 451 U.S. at 484–85. Clearly, Jackson's resumption of communication with Detective Guzinski was based, at least in part, on that misinformation.

Jackson requested a lawyer to assist him at the interrogation. He did so, according to Detective Guzinski, because "he did not want to see himself get into any further trouble as a result of this and only wanted to have a lawyer by him for such constitutional purposes."

Responding to the request, Detective Guzinski misinformed Jackson. A lawyer could have been provided. And, obviously, Detective Guzinski could have stepped out of the interrogation room and used a telephone to call the State Public Defender (just as he could have called a private lawyer for a prisoner specifically requesting that he do so).

Thus, while at first glance *Duckworth* would seem to defeat Jackson's claim, a closer reading reveals that *Duckworth* is distinguishable in two important ways. As Jackson explains:

> First, [*Duckworth*] involved a challenge to the adequacy of the *Miranda* warnings given to the defendant in that case, and did not involve an assertion of the right to counsel. Second, and more importantly, unlike the instant case, the content of the *Miranda* warnings given in *Duckworth* "accurately described the procedure for the appointment of counsel in Indiana." Thus, *Duckworth* is not controlling.

(Citation omitted.)

Detective Guzinski's inaccurate response to Jackson's request for counsel rendered Jackson's subsequent waiver of counsel involuntary.[2] A simple

[2] Needless to say, Detective Guzinski's inaccurate response also rendered Jackson's subsequent waiver unknowing. In this appeal, however, Jackson has framed his challenge in terms of voluntariness. Under *Arizona v. Roberson*, 486 U.S. 675 (1988), as previously quoted, that framework is appropriate:

> [I]f a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" *and not the purely voluntary choice* of the suspect.

proposition clarifies the point. If Detective Guzinski had misinformed Jackson, "You do not have the right to an attorney," and, as a result, Jackson confessed, we all would easily conclude that Jackson's waiver of counsel was neither knowing nor voluntary. Here, instead, Detective Guzinski misinformed Jackson by, in effect, conveying, "You do not have the right to an attorney *at this interrogation because I cannot provide one for you.*" Detective Guzinski was wrong on both points. Jackson *did* have the right to an attorney *at the interrogation,* and Detective Guzinski could have stepped outside the interrogation room to call the public defender or have another officer do so.

Thus, Detective Guzinski misinformed Jackson about his right to be represented by counsel *at the interrogation.* The result for Jackson, *at the interrogation,* was the same as it would have been had Detective Guzinski simply misinformed Jackson, "You do not have the right to an attorney." It is undisputed that, at least in part, as a result of being misinformed, Jackson surrendered exactly what he repeatedly declared he wanted to preserve: in Jackson's words, "the protection of the lawyer" and, in Detective Guzinski's words, the protection of a lawyer because "he did not want to see himself get into any further trouble as a result of this and only wanted to have a lawyer by him for such constitutional purposes." Under these circumstances, Jackson's right to counsel was not "scrupulously honored." *See Miranda,* 384 U.S. at 479.

Therefore, I conclude that Jackson's waiver of counsel was neither knowing nor voluntary. Thus, the

*Roberson,* 486 U.S. at 681 (emphasis added).

trial court erred in denying Jackson's motion to suppress and, accordingly, I respectfully dissent.[3]

---

[3] As Jackson notes, the trial court "did not ma[k]e any specific findings regarding the *Edwards* violation." (I would also note that the postconviction court, in its written decision, inexplicably stated only that it "will not revisit this issue.") Jackson contends, however, that "the undisputed facts show that [his] request for counsel was not 'scrupulously honored.' " I agree. As the quoted portions of the hearing clarify, the essential facts are undisputed and, therefore, without remanding for factual findings, we should conclude, as a matter of law, that the trial court erred in denying Jackson's suppression motion.

Jackson also argues that the postconviction court erred in not holding an evidentiary hearing on his claim that counsel was ineffective for failing to pursue a trial court challenge under *Riverside*. Denying his motion for a *Riverside* violation/ineffective assistance of counsel hearing, the postconviction court stated that even if counsel had brought the challenge, it "would not have been granted because there was no indication that the delay caused the defendant to give a statement." Jackson, however, contends that "the delay in bringing [him] before a judicial officer within forty-eight hours deprived [him] of an opportunity to make contact with a representative of the Public Defender's office, and allowed the state an opportunity to mislead Jackson into believing he could not get a lawyer before he talked to Detective Guzinski."

The State concedes that Jackson "perhaps made sufficient allegations to raise a question whether there was a *Riverside* violation here." The State also acknowledges that Jackson's "claim of deficient performance ultimately rests on the existence of a meritorious *Riverside* claim sufficient to warrant suppression of his statement." Still, the State argues that, because Jackson's arrest was followed by a trip to the hospital for emergency treatment, the "bona fide emergency" exception, recognized in *Riverside*, allowed for noncompliance with the forty-eight hour rule. The State adds that Jackson's motion offered "no allegation regarding the length of the . . . hospital

stay that would permit the conclusion that it was not long enough to render reasonable the delay in making a probable cause determination." Without the hearing Jackson has requested, however, the record does not reveal the length of the hospital stay or the details surrounding the delay. Because Jackson established a *prima facie Riverside* violation by virtue of the delay between his arrest and initial appearance, the State, not Jackson, had the burden to establish that the delay was proper. *See State v. Koch*, 175 Wis. 2d 684, 697, 499 N.W.2d 152, 159 (1993) ("When an arrested individual does not receive a probable cause determination within 48 hours, the burden of proof shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance.").

Therefore, unquestionably, the trial court also erred in denying Jackson's request for an evidentiary hearing on the alleged *Riverside* violation. Thus, if my analysis of the *Edwards* violation is incorrect, a remand still would be required for a *Riverside* hearing and the determination of whether any *Riverside* violation resulted in Jackson's confession.

(The majority applies *State v. Bentley*, 201 Wis. 2d 303, 548 N.W.2d 50 (1996) in what, I think, is a most hypertechnical manner, concluding that Jackson failed to sufficiently allege prejudice in his postconviction motion because he never claimed that, but for counsel's alleged ineffectiveness, he would not have pled guilty. The majority's approach, however, fails to acknowledge the obvious—that with the confession suppressed, counsel never would have advised Jackson to plead guilty, and Jackson would not have pled guilty, because the charge no longer could have been proven. As the State concedes, the remaining evidence could not have established intent to deliver. *See State v. Griffin*, 220 Wis. 2d 371, 584 N.W.2d 127 (Ct. App. 1998) (presence of controlled substances in a person's urine or blood, standing alone, is not sufficient to prove simple possession).)