COURT OF APPEALS
DECISION
DATED AND FILED

July 24, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP256-CR**

Cir. Ct. No. 2020CF324

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

SAMUEL A. BURNETTE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Racine County: WYNNE P. LAUFENBERG, Judge. *Affirmed*.

Before Neubauer, Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Samuel A. Burnette, pro se, appeals a judgment of conviction for first-degree sexual assault of a child and an order denying his postconviction motion.  He challenges the timeliness of his preliminary hearing, the denial of his motion to dismiss based on a speedy trial violation, the circuit court's refusal to exclude witness testimony based on spousal privilege, and the court's refusal to exclude DNA evidence found on the victim's underwear, among many other things.[1]  We reject his arguments and affirm.

## BACKGROUND

¶2    On March 12, 2020, the eleven-year-old victim alleged that Burnette had touched her vagina while she was sleeping in a hotel room with Burnette and other family, including Burnette's six-year-old son.  At the time, Burnette was in Wisconsin on an extended vacation with the victim's grandmother, with whom he was in a relationship.  The grandmother discovered the victim crying in the early morning hours, at which time the victim stated that Burnette had touched her.  When the grandmother confronted Burnette, he gave inculpatory statements regarding the sexual touching.  She then called the police.  Before law enforcement could arrive, Burnette left the hotel and returned to Texas.  He also exchanged incriminating text messages with the grandmother.

¶3    Burnette was prosecuted for first-degree sexual assault of a child and elected to represent himself at trial with court-appointed standby counsel.  Both the victim and her grandmother testified regarding Burnette's actions.

---

[1] To the extent we have not addressed a matter raised in Burnette's briefs, those arguments were either unpreserved, *see* ***State v. Huebner***, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727, or are insufficiently developed on appeal, *see* ***State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

Additionally, based on DNA evidence found on the victim's underwear, an analyst testified at trial that there was "a quadrillion times more support for the explanation that it's [the victim's] and Mr. Burnette['s DNA] than if the DNA came from [the victim] and someone who is not related to Mr. Burnette and [the victim]." Burnette testified in his own defense and explained he was adjusting the covers on the victim's bed when he inadvertently "put [his] hand where it wasn't supposed to be." The jury convicted Burnette.

¶4 Burnette was appointed postconviction counsel but again sought to represent himself. He filed a postconviction motion in 2022, alleging among other things that the circuit court lost personal jurisdiction because his preliminary hearing was untimely, his right to a speedy trial had been violated, the court had erred by denying his request to exclude the grandmother's testimony based on spousal privilege, and the DNA evidence against him should have been suppressed. The court denied relief. Burnette now appeals.

## DISCUSSION

¶5 Burnette first argues the preliminary hearing was not timely held, resulting in a loss of personal jurisdiction over him. WISCONSIN STAT. § 970.03(2) (2021-22)[2] requires the preliminary hearing to be held within ten days of the initial appearance, unless the time is extended on stipulation of the parties or on motion and for cause. The court commissioner at Burnette's initial appearance made a specific finding that the global COVID-19 pandemic—which had preceded Burnette's initial appearance by just a few weeks—provided good cause to extend

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

the time.[3]  In any event, "a conviction resulting from a fair and errorless trial in effect cures any error at the preliminary hearing."  *State v. Webb*, 160 Wis. 2d 622, 628, 467 N.W.2d 108 (1991).

¶6     Next, Burnette argues his right to speedy trial was violated. "Whether a defendant has been denied his constitutional right to a speedy trial presents a question of law, which this court reviews de novo, while accepting any findings of fact made by the circuit court unless they are clearly erroneous." *State v. Urdahl*, 2005 WI App 191, ¶10, 286 Wis. 2d 476, 704 N.W.2d 324.  A speedy trial deprivation is assessed by considering the totality of the circumstances, in particular: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his or her right; and (4) prejudice to the defendant.  *Id.*, ¶11 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

¶7     We agree with the circuit court that there was no speedy trial violation in this case.  Burnette's trial was slightly delayed by the pandemic, and he filed his first speedy trial demand in May 2020.  His trial was scheduled to commence September 1, 2020.  Just days before the trial—and after the State had made substantial efforts to facilitate out-of-state witness appearances and complete DNA analysis by that time—Burnett stated that he wanted to fire his attorney for not filing an interlocutory appeal petition that his attorney thought would be frivolous.  The court granted the withdrawal request, noting that doing so could entail significant delays based on a potential lack of available attorneys to act as successor counsel.

---

[3] Burnette subsequently waived his right to a preliminary hearing.  He later revoked the waiver and his hearing was held within ten days of the revocation.

¶8     No counsel had yet been secured for Burnette on November 30, 2020, when Burnette requested to proceed pro se. The circuit court granted that request on January 15, 2021, and provided Burnette several months to receive and review the discovery materials supplied by the State. The court then set a motion date in May 2021 to address numerous issues Burnette wished to raise in advance of trial. The trial began on June 1, 2021.

¶9     While the delay in Burnette's case slightly exceeded the one-year period after which a delay is presumptively prejudicial, *see Urdahl*, 286 Wis. 2d 476, ¶12, the vast majority of the delay period was attributable to Burnette's decision to fire his attorney and proceed pro se. "[I]f the delay is caused by the defendant, it is not counted." *Id.*, ¶26. The remaining portions of the delay period were attributable to the pandemic and typical court congestion, which are not weighed heavily against the State. *See id.* Neither Burnette's assertion of the right nor possible prejudice to Burnette suggest a speedy trial violation occurred. On this record, Burnette's assertion of a speedy trial violation fails.

¶10    Burnette next argues that the circuit court erred by failing to exclude evidence based on spousal privilege. The court rejected Burnette's efforts to shield the victim's grandmother's testimony, observing that Burnette had conceded he was not legally married and had not supplied any evidence that the two were in a domestic partnership. Burnette contends that he and the victim's grandmother were in a common law marriage under Texas law.

¶11    The spousal privilege prevents a person's spouse or domestic partner "from testifying against the person as to any private communication by one to the other made during their marriage or domestic partnership." WIS. STAT. § 905.05(1). A "domestic partnership" is defined under WIS. STAT. ch. 770 and,

among other things, requires that an individual have signed and filed a declaration of domestic partnership with the county register of deeds. *See* WIS. STAT. § 770.01(1). As the circuit court recognized, Burnette was neither legally married nor had he submitted evidence showing he had filed any declaration of domestic partnership.

¶12 Burnette contends that *Xiong ex rel. Edmondson v. Xiong*, 2002 WI App 110, 255 Wis. 2d 693, 648 N.W.2d 900, controls and required the circuit court to recognize the validity of common law marriages established outside Wisconsin. *Xiong*, however, concerned whether a person qualified as a "surviving spouse" for purposes of the wrongful death statute. Contrary to Burnette's arguments, this case is not about the validity of a marriage. It is about a statutory evidentiary privilege, which is strictly interpreted. *See Davison v. St. Paul Fire & Marine Ins. Co.*, 75 Wis. 2d 190, 197, 248 N.W.2d 433 (1977). We therefore reject Burnette's contention that Texas's marriage law should control this State's law of privilege.[4]

¶13 Relatedly, Burnette misallocates the burden of demonstrating that the privilege applies. He faults the State for failing to present "any evidence that the defendant's relationship failed to meet the requirements established by Texas State law." But the party asserting an evidentiary privilege has the burden of establishing the applicability of that privilege. *State v. Jackson*, 229 Wis. 2d 328, 336, 600 N.W.2d 39 (Ct. App. 1999). Because Burnette did not demonstrate that

---

[4] Even if we were to hold that Texas law affects the scope of the spousal privilege, we would reject Burnette's arguments. His brief fails to establish that his relationship with the victim's grandmother satisfied the dictates of Texas law. The victim's grandmother testified Burnette was her fiancé and he was "not legally" her husband.

he was legally married or in a qualifying WIS. STAT. ch. 770 domestic partnership, the circuit court properly concluded the spousal privilege did not apply.

¶14    Finally, Burnette contends the State committed a *Brady* violation[5] by both (1) failing to obtain a DNA sample from his son, who slept in the same bed as the victim on the night in question, and (2) failing to have that sample tested against the DNA evidence found on the victim's clothing.  We independently review whether a *Brady* due process violation has occurred, but we accept the circuit court's findings of historical fact unless they are clearly erroneous.  *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

¶15    A *Brady* violation occurs, among other things, if law enforcement fails to preserve evidence that was favorable to the accused.  The evidence can fall into two categories: (1) evidence with apparent exculpatory value, in which case the due process violation is clear; or (2) evidence which is only potentially exculpatory, which additionally requires a demonstration that the police acted in bad faith.  *State v. Greenwold*, 189 Wis. 2d 59, 67, 525 N.W.2d 294 (Ct. App. 1994).  Additionally, due process case law imposes a "materiality" requirement that looks to whether there is a reasonable probability that the undisclosed evidence would have changed the result of the proceeding.  *State v. Harris*, 2004 WI 64, ¶14, 272 Wis. 2d 80, 680 N.W.2d 737.

¶16    Burnette has failed to establish that the failure to collect and analyze his son's DNA rises to the level of a *Brady* violation.  The material piece of evidence here was the victim's underwear, which police suspected may have

---

[5]    *See* ***Brady v. Maryland***, 373 U.S. 83 (1963).

contained DNA from the assailant. Burnette does not claim the State unconstitutionally suppressed that evidence.

¶17 Rather, Burnette's claim is that the State was required to perform an additional comparative analysis of his son's DNA against that sample. But he has not established that the State had any duty to do so. A sample of his son's DNA was not potentially (let alone apparently) exculpatory, as Burnette had admitted to others that he had touched the victim. Additionally, Burnette fails to explain how his son's DNA could have been material given the foregoing, particularly when the crime lab analyst testified at trial that the statistical analysis accounted for the possibility of DNA from Burnette's relatives. According to the analyst, "it would still be one quadrillion times more support for it being DNA from Mr. Burnette than it would be from being a child of Mr. Burnette."

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

8