COURT OF APPEALS
DECISION
DATED AND FILED

November 9, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2022AP2216**

**STATE OF WISCONSIN**

Cir. Ct. No.  2020CV2107

**IN COURT OF APPEALS
DISTRICT IV**

BRYAN HELLENBRAND,

    PLAINTIFF-RESPONDENT,

WESTERN NATIONAL MUTUAL INSURANCE COMPANY,

    INVOLUNTARY-PLAINTIFF-RESPONDENT,

    V.

AIR TEMPERATURE SERVICES, INC. AND
CINCINNATI INSURANCE COMPANY,

    DEFENDANTS-APPELLANTS,

WEST BEND MUTUAL INSURANCE COMPANY,

    DEFENDANT.

        APPEAL from a judgment of the circuit court for Dane County:
RHONDA L. LANFORD, Judge. *Affirmed*.

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. While working as a carpenter at an industrial facility, Bryan Hellenbrand was struck in the head by a portion of ductwork that fell from where it had been suspended by wire cables from the rafters of the facility at the same time that employees of Air Temperature Services, Inc. were working to re-route one section of the ductwork. After Hellenbrand filed this negligence action, a jury at trial found for Hellenbrand in all of its verdicts. ATS and its insurer Cincinnati Insurance Company (collectively, "ATS") appeal, arguing that the circuit court made erroneous rulings on various evidentiary and legal issues and that the jury awarded excessive damages. We reject ATS's arguments and affirm.

## BACKGROUND

¶2     Hellenbrand alleged the following in his complaint and at trial. While Hellenbrand was employed by 1848 Construction as a carpenter, he was assigned to work on a project in a large space at Electronic Theatre Controls in Middleton. Hellenbrand was wearing a hardhat and safely going about his work on the work space floor.

¶3     At the same time and in the same large space, two employees of ATS—a company independent from 1848 Construction and Electronic Theatre Controls—were 25 feet above the floor, working from a scissor lift, and tasked with disconnecting and re-routing one section of ductwork that was suspended from the ceiling and measured a total of 50 feet. All six, connected sections of

ductwork were suspended from the rafters by wire cables, and the cables were held in place by cable locks, each of which could be opened or closed with the press of a button. The cable locks were designed to hold a load such as the 50-foot ductwork only when the load was static (that is, stationary), but the cable-lock system might not hold when the ductwork became dynamic (that is, moving), because the cable locks could open under dynamic conditions, releasing the cables and thus allowing loads to fall.

¶4    Hellenbrand further alleged that the two ATS employees, David Scheel and Zach Reed, had inadequate individual and combined experience and training for the task they were assigned. Scheel and Reed improperly caused a portion of the 40 feet of ductwork that extended beyond their immediate work area to fall. More specifically, Scheel cut one of the wire cables with wire cutters, and this caused the entire ductwork to become a dynamic load that the rest of the cables could no longer hold, causing a cascading failure along the ductwork. Put differently, the fluctuating load caused the release of one cable lock after another, freeing the wire cables and allowing part of the ductwork to fall. Falling ductwork struck Hellenbrand in the head, fracturing his skull and causing bleeding in the brain; this resulted in permanent, serious brain injuries such as memory loss and vertigo.

¶5    Hellenbrand alleged that ATS was directly negligent in failing to properly train and supervise its employees on the job and also negligent through its employees in failing to properly and safely execute the duct section removal and re-routing. ATS understood the risks but failed to take the steps that would have prevented the ductwork from falling in the first place, and it also failed to take steps that would have prevented injuries to people such as Hellenbrand in the event that the ductwork did start to fall.

¶6 Turning to ATS's trial theory, it contended the following. Hellenbrand was injured in an unavoidable, unforeseeable accident. Scheel and Reed removed the 10-foot section of the ductwork in a proper and reasonable way that complied with all industry standards of care, regulations, and codes, such as standards set by the federal Occupational Safety and Health Administration. While it is true that one of the wire cables supporting one section was cut during their work, the cut cable was one of the two that supported the particular 10-foot section that Scheel and Reed were working with and this was a reasonable and safe way for them to execute their tasks. Further, Scheel and Reed did not cause the extended portion of the ductwork to fall on Hellenbrand, who was working on the floor 40 feet from where Scheel and Reed were working, as measured by the distance across the floor from the base of the scissors lift to Hellenbrand. Specifically, the movement caused by Scheel and Reed to the 40-foot portion of ductwork that extended beyond their work area was virtually nonexistent and Hellenbrand's theory as to what caused the 40-foot portion to fall rested on mere speculation. In addition, given the 40-foot distance, under the proper standard of care ATS was not required to cordon off or place signage in the area of the floor where Hellenbrand was working at the time of the accident.

¶7 On the topic of Hellenbrand's injuries, ATS acknowledged that the injuries were serious and debilitating. ATS contended, however, that by the time of trial Hellenbrand had made a remarkable recovery and had returned to his job, without suffering a loss of future earning capacity.

¶8 The jury returned the following verdicts. ATS, through its employees, was negligent and its negligence was a cause of Hellenbrand's injuries. The following sums of money would fairly and reasonably compensate Hellenbrand, beyond his damages for past health care expenses and past wage

loss:[1] future loss of earning capacity, $550,000; past pain, suffering, and disability, $3 million; and future pain, suffering, and disability, $6 million.

¶9 ATS filed motions after verdict, making the same arguments that it raises now on appeal, and the circuit court denied those motions.

¶10 We provide additional background in the Discussion section as necessary to resolve the specific issues raised on appeal.

## DISCUSSION

¶11 As a threshold matter, we note that the ATS briefing on appeal contains numerous references to the possible remedy of a mistrial, but none of these many references have a chance of success because it is not disputed that ATS failed at any time during the trial to move for a mistrial. Hellenbrand quotes the settled rule that a party cannot claim an error that warrants a mistrial unless the party moved for a mistrial at trial. *See **Mulkovich v. State***, 73 Wis. 2d 464, 469, 243 N.W.2d 198 (1976). ATS's only reply on this point is to cite case law that has nothing to do with mistrials, namely, ***State v. Bergeron***, 162 Wis. 2d 521, 528-29, 470 N.W.2d 322 (Ct. App. 1991) (a motion in limine based on an argument is sufficient to preserve for purposes of appeal an objection to the admissibility of evidence based on that argument; contemporaneous objections are not necessary). The remedy of a mistrial is off the table.

---

[1] Based on stipulations between the parties, the circuit court instructed the jury that Hellenbrand's past health care expenses were $273,550.17 and that his past wage loss was $22,456.50.

¶12    Most notably, ATS purports to raise five specific issues under the "mistrial" rubric, but after Hellenbrand argues that ATS forfeited each of these five specific arguments by failing to lodge objections at trial, to request a mistrial, or to raise the issues in a motion after verdict, ATS concedes the point through silence in its reply brief, including on the topic of whether these issues could have been preserved through motions in limine or timely objections.  *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).  For that reason, we reject each of those five specific arguments and we do not further refer to the mistrial concept or any argument based on it.

¶13    Turning to the legal background here, it is relevant to several issues raised on appeal that Hellenbrand had to show the following four elements to establish his common law negligence claim:  (1) that ATS had a duty of care; (2) that ATS breached this duty; (3) that there was a causal connection between ATS's conduct and Hellenbrand's injury; and (4) that there was an actual loss or damage as a result of the injury.  *See Coffey v. City of Milwaukee*, 74 Wis. 2d 526, 531, 247 N.W.2d 132 (1976).

## I.  CAUSATION-RELATED ISSUES

¶14    Regarding the third element that Hellenbrand was required to prove, causation, ATS makes a series of assertions that generally involve references to testimony by engineer Lester Engel, called by Hellenbrand at trial, with passing references to Robert Wozniak, another engineer called by Hellenbrand at trial. These assertions include that the circuit court erred in denying ATS's motions to preclude testimony by Engel and Wozniak addressing causation and that the court

should have granted ATS's motions for a directed verdict, as well as motions after verdict, based on the alleged lack of proof of causation.

¶15 We observe generally that ATS's causation-related arguments are all either undeveloped or underdeveloped. Counsel for ATS appears to operate under the mistaken impression that an issue is sufficiently briefed on appeal if a party makes some potentially relevant references that we theoretically could, on our own initiative, analyze under the proper legal standards—as opposed to presenting us with developed arguments that pull together all relevant facts and law. This is incorrect. *See* **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (This court may decline to review issues that are inadequately briefed.); **State v. Jackson**, 229 Wis. 2d 328, 337, 600 N.W.2d 39 (Ct. App. 1999) (This court typically will not scour the record to develop viable, fact-supported legal theories on an appellant's behalf.). With that caveat, we now identify and address discernable issues as best we can.

### A. Additional Background

#### 1. *Engel*

¶16 Engel testified to the following regarding his background. He is a professional engineer, and he specializes in metallurgy and failure analysis. He has a Master of Science degree in metallurgical engineering. He started performing failure analysis in 1969 while working in the aircraft engine group at the General Electric Company. Starting in 1983 and continuing to the time of trial here, he had run his own firm, which had performed "thousands" of failure analyses for industrial clients, attorneys, and insurance companies.

¶17 Engel further testified that, after counsel for Hellenbrand asked him to investigate the accident here, he reached relevant opinions by following standard protocols in the fields of metallurgy and failure analysis. This included reviewing: photographs of the scene; investigation reports and diagrams created by the ATS safety manager, Ryan Dodge; and transcripts of witness depositions. Engel also inspected component parts involved in the accident and conducted research regarding the parts, including the wire cables that held the ductwork in place before part of it fell.

¶18 In a pretrial motion, ATS argued that, under WIS. STAT. § 907.02(1) (2021-22) and case law interpreting that evidentiary rule, Engel should not be permitted to give expert testimony amounting to "mechanical engineering testimony and opinions that fall outside his field of expertise [of metallurgy], [that are] are not sufficiently based in fact, and [that] constitute inadmissible ipse dixit."[2] *See State v. Hogan*, 2021 WI App 24, ¶26, 397 Wis. 2d 171, 959 N.W.2d 658 (interpreting § 907.02(1)).[3] The circuit court ruled that Engel was "able to

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[3] WISCONSIN STAT. § 907.02(1) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

This statute adopts the federal "reliability" standard developed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which is codified by Federal Rule of Evidence 702. *State v. Hogan*, 2021 WI App 24, ¶18, 397 Wis. 2d 171, 959 N.W.2d 658.

render opinions on metallurgical issues; and to an extent, based upon the experience that he has, to also provide … what I would call some limited mechanical engineer opinions." On this basis, the court denied the motion to exclude Engel's testimony, but invited ATS to consider renewing its objection during trial, depending on the specific nature of the testimony.

¶19 At trial, Engel opined to the following to a reasonable degree of metallurgical and failure analysis certainty. Scheel, while working on the ductwork from the elevated scissor lift, cut a wire cable that held up one section of the ductwork, and that when he did this, it "was just enough to upset the balance in the whole assembly of that ductwork hanging with all of those wire" cables. The load became dynamic, which in turn caused the remaining wire cables to slip out of their cable locks, with the result that part of the duct fell to the floor and onto Hellenbrand. The wire cables "did not fail or separate." Instead, down the line the wire cables "just literally pulled out of the little locking mechanism" of each cable lock.[4]

¶20 Renewing its pretrial objection at trial, ATS argued that Engel was not qualified to render these opinions because they did not involve "metallurgical testimony," but instead this was "mechanical engineering testimony about load

_____

[4] For context, we note that the jury was read the following related caution contained in literature of the Sheet Metal and Air Conditioning Contractors' National Association:

> "The selection of a hanging system should not be taken lightly not only because it involves a significant portion of the erection labor, but also because an inadequate hanging system can be disastrous. In any multiple hanger system, the failure of one hanger transfers its load to adjacent hangers. If one of these fails, an even greater load is transferred to the next. The result can be a cascading failure in which an entire run of duct might fall."

transfers." Hellenbrand responded that Engel had explained his relevant background in both metallurgy and failure analysis and that therefore his testimony involving the wire cables, locks, and his theory of dynamic failure in this context was admissible. The circuit court overruled the objection.

¶21 Pertinent to the issues that ATS raises on appeal, the circuit court denied ATS's motion for a directed verdict at the close of Hellenbrand's case, pursuant to WIS. STAT. § 805.14(1), based on a failure to provide proof of causation, and also denied ATS's motion after verdict based on the same theory.

### 2. *Wozniak*

¶22 Wozniak testified to the following regarding his background. He has undergraduate and master's degrees in mechanical engineering and is a licensed professional engineer specializing in mechanical and safety engineering. By the time of trial here, he had consulted with insurance companies and law firms regarding "all types of accidents" for both plaintiffs and defendants in civil cases, including numerous insurance companies. His professional work over the course of a 30-year career has been "to answer questions about how accidents happened; how [they] might have been prevented; give opinions about what happened in an accident." This has included construction safety cases, including conducting "safety hierarchy analysis."[5] In addition, he worked as a mechanic for five years

---

[5] In addition, the circuit court was presented with an affidavit, in which Wozniak averred the following:

(continued)

10

at a rental center, where he had experience with a mechanical lift that could elevate workers 20 to 30 feet in the air, and also analyzed several cases involving Heating Ventilation and Air Conditioning (HVAC) installations, including systems relying in part on wire cables.

¶23 Wozniak further testified that, at the request of counsel for Hellenbrand, he reviewed transcripts of witness depositions, other expert reports, photographs taken of the scene, and diagrams created by ATS safety manager Dodge. Wozniak also inspected the wire cables and cable locks that had held the ductwork in place before the accident. He also reviewed the ATS safety manual.

¶24 ATS had a standing objection to all questions posed to Wozniak regarding safety, safety hierarchy, and safety engineering. ATS also objected that Wozniak's testimony lacked a sufficient "foundation." The circuit court denied these objections, ruling that Wozniak was sufficiently qualified to opine on the topics at issue and explaining that ATS failed to persuade the court that ATS's objections did not boil down to arguments about the weight that the jury should give to Wozniak's testimony.

¶25 Wozniak testified at trial in pertinent part that "well in advance" of the start of any construction project, a safety director should proceed to identify possible fall hazards, but in this case ATS did not do that. He based this in part on

---

In my years as a safety engineer, I have analyzed a wide variety of cases related to construction and construction failure. The types of cases include but are not limited to: multiple personnel lifts (scissors, boom and telehandlers), fall object protection and fall hazards, scaffolding, roadway construction accidents, construction site accidents involving ladders, falls and injuries, including ladder requirements, multiple skidsteer/tractor construction injuries and maintenance injuries.

the basic engineering principle that, if a design hazard cannot be eliminated, then the designer should take steps to "guard against th[e] hazard" and to "isolat[e] people from the hazard." Wozniak testified that he could see no evidence that any ATS representative, including ATS safety director Dodge, tried to prevent the falling hazard from occurring.

¶26 In a related vein, Wozniak opined that, if ATS had developed an appropriate plan to eliminate the hazard of a fall of any part of the 50 feet of ductwork and to guard against such a hazard, it could have prevented Hellenbrand's injury. Based in part on Wozniak's interpretation of the manual of the company that manufactured the cable locks, he testified that the wire cable-lock system holding up the ductwork was designed to hold only "a static load," and there was a potential for the locks to open if dynamic forces were applied to the ductwork. The movements of Scheel and Reed in working on the 10-foot section, which they physically supported and attempted to remove, together with their cutting one of the wire cables supporting the ductwork, caused dynamic forces that travelled "like a zipper down the row," causing one wire cable after another to slip out of their respective locks and the ductwork to fall, because all of the sections were connected and the ductwork as a unit became "overload[ed]." Regarding the movements of Scheel and Reed, in attempting to complete their tasks, given the dimensions and configurations of the duct sections and the space they needed, they had to have caused the entire ductwork to move. In sum, the activities of Scheel and Reed caused the cables down the line to slip out of their respective locks, which is the same conclusion that was reached by ATS safety director Dodge.

¶27 In testifying that, to a reasonable degree of engineering probability, ATS failed to take reasonable safety steps to prevent the ductwork from falling or

to prevent injuries if it did, Wozniak relied in part on a manual that was created by ATS to address safety issues. For example, the manual stated that "identification of fall hazards should begin well in advance of" the start of a project, and if a fall hazard could not be "practically eliminated," then "consideration shall be given to implementing effective means of fall prevention."

### B. *Daubert* motion

¶28 The pertinent legal standards for a *Daubert* motion are concisely summarized in *Hogan*:

> WIS[CONSIN] STAT. § 907.02(1) requires the trial court to determine, by a preponderance of the evidence and according to whichever criteria it deems appropriate, that the proffered expert testimony is based on adequate facts and a sound methodology and is thus sufficiently reliable to go before a jury. We review that decision for an erroneous exercise of discretion, meaning we will uphold the trial court's ruling where it "consider[ed] the relevant facts, applie[d] the correct law, and articulate[d] a reasonable basis for its decision." This standard is highly deferential: we will search the record for reasons supporting the trial court's decision, and we will sustain a ruling even where we disagree with it, so long as appropriate discretion was exercised.

*Hogan*, 397 Wis. 2d 171, ¶26 (cited cases omitted).

¶29 Regarding Engel, ATS argues that the circuit court's ruling permitting him to testify is subject to our de novo review because, according to ATS, the court did not make a pretrial ruling and thereby failed to apply the proper standards under WIS. STAT. § 907.02(1). But this is inaccurate. As summarized above, the court denied ATS's pretrial motion to bar testimony by Engel, invited ATS to consider renewing its motion at trial if the circumstances called for it, and

13

then (when ATS renewed the objection when Engel testified) affirmed its pretrial ruling.

¶30    In a largely conclusory and unsupported manner, ATS asserts that the circuit court "did not consider facts of record that overwhelmingly demonstrated the speculative nature of Engel's and Wozniak's causation opinions."  We reject this assertion and affirm under the correct standard of review.  It is sufficient to note the following.

¶31    In a single sentence that does not appear in an argument section of its briefing, ATS suggests that the circuit court erroneously exercised its discretion in allowing Engel to testify because he lacked a sufficient background in mechanical engineering and lacked specific information about "the weight of the ductwork," "the specific location of any given cable along the line of ductwork[,] or how the cables were spaced or positioned, and performed no calculations concerning the weight of the ductwork or the forces at play in the system."  ATS makes a similar assertion regarding Wozniak.  However, ATS generally fails to explain what calculation or calculations were necessary or more specifically explain why the lack of discussion of a particular calculation was fatal to the opinions of Engel or Wozniak.  That is, if a missing mathematical formula or physics principle was needed, ATS's briefing does not tell us what that might have been.  More generally, ATS fails to flesh out its assertions by explaining why either Engel's or Wozniak's engineering education, training, and experience, summarized above, were insufficient, and also fails to explain why the kinds of information to which it now only generically alludes was necessary to support the particular opinions that either gave.

¶32    Regarding Wozniak, ATS selectively quotes one line of testimony in which Wozniak said that he did not know "exactly" how the accident occurred, but then fails to come to grips with the many times that Wozniak provided a coherent explanation of how he believed it occurred, summarized above.

¶33    Stepping back, ATS attempts to suggest that the shared causation theory endorsed by Engel and Wozniak, summarized above, was illogical or required detailed calculations, but it does not provide a basis for those suggestions. To the contrary, the shared theory appears on its face to be coherent and consistent in explaining how a portion of 50 feet of connected ductwork could slip out of its only supporting elements—cable wires strapped around the ductwork and held in place by cable locks that can release under dynamic conditions—when the jury had available evidence from which it could find that dynamic forces were applied to the ductwork. This defeats ATS's thinly developed assertion that the experts relied only on "ipse dixit"-style reasoning in a dogmatic or illogical manner.

### C. Motion for directed verdict & motion after verdict

¶34    ATS asserts that the circuit court should have granted its motion for a directed verdict made at the close of Hellenbrand's case, and granted the motion after verdict, due to the lack of a valid causation theory. More specifically, regarding the motion after verdict, ATS argues that the court was obligated to change the jury's causation verdict from "yes" to "no."

¶35    A motion for a directed verdict challenges the sufficiency of the evidence. *Emer's Camper Corral, LLC v. Alderman*, 2019 WI App 17, ¶14, 386 Wis. 2d 592, 928 N.W.2d 641, *aff'd*, 391 Wis. 2d 674, 943 N.W.2d 513 (2020). A circuit court may grant the motion only if it "is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable

to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." WIS. STAT. § 805.14(1). Given the circuit court's superior position to assess the weight and relevance of trial testimony, we give substantial deference to circuit court rulings and will not overturn a decision "unless the record reveals that decision was 'clearly wrong.'" *Emer's*, 386 Wis. 2d 592, ¶14 (quoted source omitted).

¶36 ATS asserts that we should apply a de novo standard of review to the directed verdict issue, but it completely fails to support that assertion and on that basis we reject it.

¶37 "When considering a motion to change the jury's answers to verdict questions, we view the evidence in the light most favorable to the verdict and affirm the verdict if it is supported by any credible evidence." *Kubichek v. Kotecki*, 2011 WI App 32, ¶14, 332 Wis. 2d 522, 796 N.W.2d 858; *see also* WIS. STAT. § 805.14(1). "The standard of review is even more stringent where, as here, the [trial] court upheld the jury's findings on motions after verdict." *Kubichek*, 332 Wis. 2d 522, ¶14. We will uphold the jury's verdict absent "'a complete failure of proof [such] that the verdict must be based on speculation.'" *Id.* (quoting *Coryell v. Conn*, 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979)).

¶38 ATS argues that the circuit court was obligated to grant the motion for a directed verdict and the motion to change the jury's causation finding based on Engel's testimony because the court erred in not accepting the following argument by ATS: Engel should not have been allowed to testify, and Hellenbrand failed to establish causation, because there was not a "chain of custody" sufficient to support the proposition that the particular wire cable that Engel "tested and that he contended Scheel cut … was in fact the cable [that]

Scheel cut [to begin] the chain reaction whereby the [cable locks] gave way." Instead, ATS argues, the court should have determined that, while the cable that "Engel tested … was labeled Cable No. '2,'" Engel merely "speculatively assumed without supporting evidence that [Cable No. 2] was the 3rd cable from the left [that] Scheel supposedly cut."[6]

¶39 However, Scheel testified that the third wire cable from the left "snapped" at a key moment, relative to the ductwork portion that fell to the floor, when Scheel and Reed were removing the 10-foot duct section. ATS does not persuade us that the circuit court could not properly allow the jury to consider crediting Engel's testimony, and for that matter Wozniak's similar testimony, to the effect that the event that Scheel testified as involving a "snap" of the wire cable was in fact the intentional cutting of that cable (the one that Engel testified he had tested), which would have been a finding consistent with the jury's liability findings.

¶40 Regarding ATS's "chain of custody" argument, the jury heard testimony to the following effect. After the accident, all of the wire cables on the scene (by then, some were lying on the floor but most were still suspended from the rafters) were collected by ATS employees and delivered to the president of Hellenbrand's employer, 1848 Construction, who secured them and then made them available to the parties for inspection. Given this evidence, ATS does not persuade us that the circuit court erroneously exercised its discretion in determining that ATS's concerns about the wire cables as evidence could be

---

[6] The "from the left" reference is based on a side-view orientation as one faces the ductwork when the portion that fell and struck Hellenbrand is on the right and the section of the ductwork that Scheel and Reed were working on is on the left.

17

satisfactorily addressed through whatever cross examination ATS decided to pose, and that ATS's objection involved a dispute over the weight that the jury should give to testimony regarding the wire cables and not to the admissibility of any such testimony. "The law with respect to chain of custody issues requires proof sufficient 'to render it improbable that the original item has been exchanged, contaminated or tampered with.'" *State v. McCoy*, 2007 WI App 15, ¶9, 298 Wis. 2d 523, 728 N.W.2d 54 (quoted source omitted). "A perfect chain of custody is not required. Alleged gaps in a chain of custody 'go to the weight of the evidence rather than its admissibility.'" *Id.* (citation and quoted source omitted).

## II.  DUTY OF CARE-RELATED ISSUES

¶41    To repeat, the first two elements that Hellenbrand was required to prove were that ATS had a duty of care and that it breached that duty. *See Coffey*, 74 Wis. 2d at 531. Regarding these elements, ATS briefly suggests that, "[g]iven the *Daubert* violations and the complete lack of expert testimony establishing standards of care, the circuit court erred in denying [ATS's] motion to change" the jury's answer to the negligence question from "yes" to "no." The closest that ATS comes to presenting a developed argument on this topic is to argue that Wozniak's testimony regarding ATS's alleged breach of a standard of care was inadmissible and without substance; to the extent that ATS intends to make other arguments, we deem them insufficiently developed to warrant consideration. We now address ADS's somewhat developed standard-of-care argument regarding Wozniak's testimony.

¶42    ATS's primary challenge to Wozniak's testimony is to assert that the circuit court failed to recognize that his testimony was not admissible because of the following:  Wozniak lacked sufficient training or experience in cases involving

wire cable locks or HVAC systems; he did not review HVAC industry codes or regulations, governmental standards, or federal Occupational Safety and Health Administration standards in arriving at his negligence opinions; and instead he relied on his review of ATS's own safety manual, 1848 Construction's manual, and literature from the maker of the cable locks.

¶43 We agree with Hellenbrand that the circuit court did not err as a matter of law in rejecting ATS's argument that Wozniak had to show evidence of training and experience in the specific areas of cable locks or HVAC installation or design to give the testimony that he gave. *See Karl v. Employers Ins. of Wausau*, 78 Wis. 2d 284, 297, 254 N.W.2d 255 (1977) ("the law traditionally has permitted limited testimony of a medical nature by one not licensed as a medical doctor, if he is, in fact, qualified as an expert" (citation and quotation marks omitted)); *Wester v. Bruggink*, 190 Wis. 2d 308, 319-20, 527 N.W.2d 373 (Ct. App. 1994) ("[W]hether a witness qualifies to testify as an expert depends on the witness's background, education[,] and experience rather than a particular label."). The background we have summarized above was sufficient to support the court's ruling that he could offer opinions regarding fall hazards and protections at a construction site, whether the danger at issue arises from potentially falling ductwork or instead some other type of object.

¶44 ATS refers to "the HVAC standard of care," but that misses the target. This case does not involve a failure involving the operation of the HVAC system, which might have required HVAC-system-specific knowledge. Instead, this was a failure involving materials that were suspended from the ceiling and a work project that allegedly caused connected sections to fall. Further, ATS fails to support an argument, based on relevant citations to the record and legal authority,

that Wozniak relied on any improper source in reaching the opinions he gave, separate from ATS's evidentiary arguments that we reject in the next section.

## III. EVIDENTIARY DECISIONS

¶45    ATS refers to some evidentiary decisions made by the circuit court, which we identify and address in turn.[7]

¶46    Circuit court decisions to admit or exclude evidence are reviewed for erroneous exercises of discretion. *Allsop Venture Partners III v. Murphy Desmond SC*, 2023 WI 43, ¶23, 407 Wis. 2d 387, 991 N.W.2d 320.  "As long as the circuit court 'examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion,' we will not disturb its ruling." *Id.* (quoted source omitted).

*Lack of barricade evidence*

¶47    ATS argues that the circuit court erroneously exercised it discretion in permitting evidence that, at the time of the project, it failed to erect a barricade on the floor of the work space underneath the scissors lift, because the accident occurred 40 feet away and therefore a barricade under the scissors lift would not have prevented injury to Hellenbrand.

---

[7] We need not and do not address the merits of one particular evidentiary argument made by ATS, namely, that the circuit court should not have permitted some testimony by ATS safety director Dodge.  This is because of a concession by ATS through its silence in its reply brief.  *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).  Through silence ATS concedes that, as Hellenbrand argues, ATS's failure to include this argument in its motions after verdict "constitutes a waiver" of the alleged circuit court error, regardless of whether a proper objection was lodged at trial.  *See Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 417, 405 N.W.2d 354 (Ct. App. 1987); *Suchomel v. University of Wisconsin Hosp. & Clinics*, 2005 WI App 234, ¶10, 288 Wis. 2d 188, 708 N.W.2d 13.

¶48     When ATS raised this as an issue in a motion in limine, Hellenbrand raised several objections at a pretrial hearing, which included the concept that evidence that ATS's failure to erect a barricade under the lift could be valid evidence to impeach ATS witnesses on such topics as whether they did or did not follow all applicable safety rules. The circuit court held its ruling in abeyance, to allow it to consider the specific testimony or argument that actually surfaced at trial.

¶49     During the course of trial, ATS renewed the motion. Among the positions that Hellenbrand took was the following: the absence of a barricade under the lift could be used to impeach Scheel's own testimony regarding the potential for a barricade and what purpose it would have served. The circuit court agreed that this was a valid topic for impeachment, but invited ATS to consider submitting a curative instruction to make sure that the jury clearly understood that ATS's failure to erect a barricade under the lift could not be considered a cause of Hellenbrand's injuries. However, ATS did not request a curative instruction.

¶50     Regarding additional impeachment on this topic, Hellenbrand impeached ATS safety director Dodge after he testified twice that barricades were in place around the base of the lift at the time of the accident, before admitting that this was not the case.

¶51     ATS essentially argues that the circuit court should have understood that a jury would necessarily have treated evidence on this topic as evidence of cause, but ATS fails to address the merits of the impeachment rationale for the admissibility of the evidence or to identify particular testimony that could not be supported by that rationale. ATS did not take up the court's invitation to submit a curative instruction to the jury on this specific point. Further, more generally, we

are not persuaded that the court failed to consider relevant facts, apply a proper legal standard, and rely on a rational process to reach a reasonable conclusion to allow this evidence for impeachment purposes. ATS fails to develop an argument that impeachment was not a proper basis to allow the evidence that was allowed in the context of the case as it was tried.

*Subsequent remedial measures*

¶52    ATS asserts that the circuit court misinterpreted WIS. STAT. § 904.07 in allowing Hellenbrand to introduce evidence of subsequent remedial measures that ATS took.[8] We reject this assertion as an argument for the following reason.

¶53    In its opening brief ATS does not even attempt to explain a way in which the circuit court misinterpreted this statute, when the exceptions to the general rule of exclusion are taken into account. Indeed, in that brief ATS completely ignores the rationales that were actually given by the court for these evidentiary rulings, which relied on the exceptions to the general rule of exclusion, specifically for situations involving proof of the "feasibility of precautionary measures, and for impeachment." In addition, after Hellenbrand directs us to the

---

[8] WISCONSIN STAT. § 904.07 ("Subsequent remedial measures") provides a general rule of exclusion and then identifies exceptions to that rule:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This section does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment or proving a violation of [WIS. STAT. §] 101.11[, the safe place statute].

22

court's actual rationales and to record support for the court's rulings, what comes back in ATS's reply brief are merely conclusory assertions.

*ATS safety manual*

¶54 ATS filed a motion in limine to prevent Hellenbrand from relying on ATS's safety manual at trial, arguing that "Wisconsin law is clear that a company's safety policies, procedures, manuals, handbooks, these types of things, do not set the standard of care." The circuit court implicitly acknowledged the general rule that such materials should not be relied on for the purpose of setting a standard of care, unless the materials explicitly embody a proper source of a standard, such as code provisions. *See **Johnson v. Misericordia Cmty. Hosp.***, 97 Wis. 2d 521, 537-38, 294 N.W.2d 501 (Ct. App. 1980) (hospital's bylaws fell within a narrow exception to the general rule of exclusion because they were required by Wisconsin law as part of the licensing procedure that applied to all hospitals, with the result that "an entire industry or substantially an entire industry had essentially the same safety regulations."), *aff'd*, 99 Wis. 2d 708, 301 N.W.2d 156 (1981). However, the court distinguished between Hellenbrand's improperly using the manual as a purported standard of care and his properly using it as an admission against interest to impeach on the issue of foreseeability. As the court concisely explained to counsel for ATS:

> Because, essentially, if you are arguing this was not a foreseeable accident but you have a safety manual that talks about all the ways this is foreseeable, that's different than setting a standard of care. That's impeaching your position that this was not foreseeable, so I think that the manual can be used for many different purposes.

23

With that explanation, the court denied the motion to prohibit all references to the manual, but it also invited ATS to object during trial if Hellenbrand was attempting improperly to use the manual to set a standard of care.

¶55     ATS's argument on this issue is difficult to track, but the following suffices to reject it.  ATS inaccurately refers to "[t]he circuit court's decision to allow company safety manuals to establish the standard of care."  As just explained, the court did not make that ruling and it is misleading for ATS to purport to build an argument on this inaccurate reference.  ATS fails to develop an argument that begins with the proper starting point of what the court actually ruled.  Further, ATS fails to direct us to a place in the record at which ATS took up the court on its invitation to tell the court that the manual was being used to establish a standard of care, as opposed to being used to impeach ATS on the foreseeability issue.  Again, we typically do not scour the record to develop viable, fact-supported legal theories on an appellant's behalf and we see no reason to do so on this occasion.  *See **Jackson***, 229 Wis. 2d at 337.

*Cable lock manufacturer's literature*

¶56     ATS argues that, while in its view the circuit court correctly ruled that Hellenbrand could not offer into evidence literature created by the manufacturer of the cable locks at issue, the court failed to properly prevent such literature from being introduced.  In response Hellenbrand presents an argument, supported by record citations, that ATS's argument is inaccurate and misleading, because in fact no such literature was admitted.  In reply, ATS essentially retreats to the following position, which is a stark departure from its initial position on appeal:  despite the fact that there was no contemporaneous objection, it was improper for the circuit court to allow Hellenbrand's counsel to briefly ask an

24

expert retained by ATS to confirm that a statement contained in a publication of the Sheet Metal and Air Conditioning Contractors' National Association (quoted *supra*, note 3) is also reflected, at least using "similar language," in literature of the cable manufacturer.

¶57    Given the way that ATS has briefed this issue, we could reject it on multiple grounds.  It is sufficient to observe that this passing confirmation by ATS's expert that the particular statement at issue was contained not only in the Sheet Metal and Air Conditioning Contractors' National Association material but also, with some unknown wording in some manner, similarly reflected in literature of the cable manufacturer could not possibly have affected a substantial right of ATS.  *See **Martindale v. Ripp***, 2001 WI 113, ¶¶30-32, 246 Wis. 2d 67, 629 N.W.2d 698 (reversal is not appropriate based on an erroneous exercise in discretion to admit evidence; there must be a reasonable possibility that the error contributed to the outcome of the proceeding); WIS. STAT. §§ 805.18(2), 901.03(1).

## IV.  FOR CAUSE STRIKES OF PROSPECTIVE JURORS

¶58    During the voir dire process, the circuit court interpreted ATS as forfeiting its opportunity to move to strike members of the jury venire for cause. ATS argues that the court's interpretation of its position regarding for-cause strikes was wrong and that as a result ATS was improperly forced to use all of its preemptory strikes on potential jurors who should have been stricken for cause. We now provide additional background and then explain why we affirm on this issue, based on the ground that ATS forfeited its right to move for strikes for cause.

### A. Additional Background

¶59    After the circuit court and counsel wrapped up their questioning of the members of the jury venire, the court explained to the entire courtroom that the proceedings had reached the point when "the lawyers will select the jurors." The court explained that this would take "a few minutes." The court excused those "remaining in the gallery." The transcript then reflects the following exchanges:

| | |
|---|---|
| [Counsel for ATS]: | Can we—can we have a sidebar? Sidebar? Can we have a sidebar? |
| THE COURT: | Before they leave? |
| [Counsel for ATS]: | No, I mean after they leave. |
| THE COURT: | It's not about me excusing them? |
| [Counsel for ATS]: | No. |
| THE COURT: | Okay. Then, yes, please come forward. |
| | (Sidebar begins) |
| [Counsel for ATS]: | I've got motions to strike for cause. |
| THE COURT: | Well, you can't do that now. I just excused the jury. If you strike them for cause, then— |
| [Counsel for ATS]: | I didn't have a chance. |
| THE COURT: | Well, of course you had a chance. Of course you had the chance. |
| [Counsel for ATS]: | No, I didn't. |
| THE COURT: | Yes. You're supposed to say "sidebar" after you have your issues with them. I just excused every single person to go home. If you strike them— |
| [Counsel for ATS]: | We still might have enough. |

THE COURT:      No. You're each getting five preemptory strikes.

[Counsel for ATS]:      What?

THE COURT:      You're each getting five strikes. And we'll have fourteen left, twelve jurors and two alternates. That's why I asked you do you want to make your motion before I send those people home.

[Counsel for ATS]:      I didn't hear that.

THE COURT:      Okay. You need to start listening. I mean, how many times today have you not understood what I'm plainly telling you[?] That's the reason I asked you. I'm not going to entertain motions for cause because you had the opportunity. I asked you before all those people left. I cannot get them back. You have five preemptory strikes a side. We're moving forward.

¶60 The circuit court then empaneled the jury and had the jurors sworn in. In a discussion with the attorneys that followed, the court pointed out that it had specifically asked counsel whether he was making a motion before the court "excuse[d] the gallery jurors," meaning before it excused those potential jurors who could fill the spots of jurors struck for cause, and that ATS's counsel had in effect responded, "No, let them go." The court said, "I can't let all those [potential] jurors go and then entertain motions to strike the ones here [for cause] because then we'd have to start all over again. And that's the reason I asked the question." The court said that it believed that it had previously made clear to the parties that motions for strikes based on cause would involve a sidebar requested by counsel during the course of jury selection, made at times when issues suggesting a basis for a cause strike arose.

27

¶61 ATS's counsel identified five potential jurors that he represented he would have moved to strike for cause if he had understood the circuit court's expectations about how he needed to make his motions. The court said that if counsel had raised timely motions to excuse these potential jurors it would have denied the motions on the merits.

¶62 In addressing motions after verdict, the circuit court asked ATS's counsel how it was supposed to have responded, "after the fact," to counsel's own error in forfeiting for-cause strike motions, particularly in light of the fact that the court had specifically asked if the court could release the venire members in the gallery of the courtroom and counsel had responded in the affirmative. The court asked counsel: "How is that my error and not yours?"

**B. Analysis**

¶63 One basis for the circuit court's rejection of ATS's argument regarding for-cause strikes was that ATS forfeited its right to make such motions. The court's logic was that it could hardly have been error for the court to fail to entertain motions that ATS made only after it waited until it was completely impractical for the court to grant the motions. ATS's brief-in-chief does not refer to any issue of forfeiture or waiver and also fails to come to grips with the court's finding that the untimely motions would have required the court to start voir dire all over again. ATS asserts that the court subjected ATS's counsel to "bizarre and improper procedure," but it completely fails to back up the assertion that the court's procedure of requiring counsel to address strikes for cause during the course of jury selection was "bizarre" or "improper."

¶64 After Hellenbrand argues in response that ATS forfeited its right to move to strike any juror for cause, relying on a detailed summary of the record

that includes background given above, ATS essentially disregards the parts of the record supporting Hellenbrand's argument and the circuit court's findings that ATS could have and should have raised its motions to strike before the court excused the remaining potential jurors. Instead, ATS tries to suggest that the record establishes that potential jurors could have been recalled to the courtroom after ATS first raised its motions. We disagree that the record establishes this. One reasonable interpretation of the record is that ATS alerted the court to its motions to strike only when it was too late. Further, the record clearly reflects that the court was consistent in taking the position that the motions came too late. In short, ATS fails to establish that the court clearly erred in making its findings. Summarizing our conclusion more broadly, the court had an ample basis in the record to rule that ATS: explicitly gave its approval to the court releasing the jurors in the gallery; explicitly told the court that ATS had nothing to raise regarding excusing members of the potential jury panel before the court did so; and raised its motions only after it was in fact too late for the court to entertain them.

## V. REMITTITUR REQUEST

¶65 Recall that the jury awarded Hellenbrand the following amounts that are at issue on appeal: future loss of earning capacity, $550,000; past pain, suffering, and disability, $3 million; and future pain, suffering, and disability, $6 million. ATS argues that the $550,000 for loss of future earning capacity was "excessive, unreasonable, and unsupported by the evidence" and that the total of $9 million for past and future pain, suffering, and disability is "grossly excessive" when compared with $925,000 determined to be "reasonable and fair" for the plaintiff in *Herman v. Milwaukee Children's Hospital*, 121 Wis. 2d 531, 547, 361 N.W.2d 297 (Ct. App. 1984). We reject these arguments.

¶66    An award of damages is excessive under WIS. STAT. § 805.15(6) when it "reflects injuries not proved or 'a rate of compensation beyond reason.'" *Staskal v. Symons Corp.*, 2005 WI App 216, ¶38, 287 Wis. 2d 511, 706 N.W.2d 311 (quoted source omitted). When considering a motion to reduce a damages award, the circuit court must "view the evidence in the light most favorable to the jury's verdict." *Id.*, ¶39. Under this standard, the court affirms a challenged award "if there is any credible evidence under any reasonable view that supports the jury's finding on the amount of damages." *Id.*; *see also* **Roach v. Keane**, 73 Wis. 2d 524, 539, 243 N.W.2d 508 (1976) ("Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience...." (quoted source omitted)). On appeal, "we view the jury's verdict 'with particular favor'" when, as occurred in this case, "the circuit court has analyzed the evidence in reaching its decision." *Staskal*, 287 Wis. 2d 511, ¶40 (quoted source omitted).

### A. Additional Background

¶67    In addressing ATS's challenges to damages as part of the motions after verdict, the circuit court (the same judge who had presided at trial) expressed the view that the jury was presented with evidence of a 46-year-old person who before the accident

> liked to work, loved his job, was a fun guy, had friends, had a normal life, an accident happened, and [then] his life was completely changed. [Thirty five] years remaining in his life expectancy, and he is, as I believe a supervisor at the 1848 said, he's not the same Bryan. And I think the jury in looking at … the remainder of Mr. Hellenbrand's life where he would have difficulty with short-term memory, cognitive fatigue, not be able to engage in the activities that

30

he did before the accident, having a changed personality, having his family and friends realizing it, and probably even most substantially for him that he realizes it and he understands and knows his deficits even though he has tried his best to overcome them.… I believe the jury's verdict regarding damages is supported by the evidence that [the jury] saw at trial.

The future earning capacity issue … goes to the weight the jury gave to [the testimony of the vocational expert called by Hellenbrand, Kevin Schutz] over the defense expert. Mr. Schutz … gave his opinion on future earning capacity, and the jury chose to look at Mr. Schutz's opinion and give weight to his testimony as the numbers that he gave for future earning capacity falls squarely within Mr. Schutz's vocational rehabilitation analysis[,] which … was a proper analysis under the tenets of vocational rehabilitation field. And the jury chose to [give] weight and credibility to Mr. Schutz's testimony. There's nothing in this record that would cause the Court to change that number because there was ample evidence on this record to support the jury's conclusion.

## B. Analysis

¶68 **Future loss of earning capacity**. Regarding this particular category of damage, our supreme court has stated that due to the challenges inherent in trying to predict the always uncertain earnings futures for individuals, "the quantum of proof required to sustain a finding of loss of future earning capacity is not as great as that required in other damage issues." *Krause v. Milwaukee Mut. Ins. Co.*, 44 Wis. 2d 590, 616, 172 N.W.2d 181 (1969).

¶69 ATS does not argue that the evidence would have supported only some particular figure below $550,000. Instead, it critiques the testimony of Hellenbrand's vocational expert, Kevin Schutz, in various ways. But as just noted, the circuit court expressed the view that the jury was entitled to place weight on Schutz's opinions. As noted above, we are to generally defer to such assessments by circuit courts that have first-hand exposure to all relevant evidence.

31

¶70 ATS suggests that, because Hellenbrand had by the time of trial returned to his work as a carpenter with the same employer, he could not show impairment of earning capacity into the future. But Hellenbrand correctly notes that our supreme court in *Krause* rejected that premise in addressing a similar argument made in that case, to the effect that "the fact [that] plaintiff was able to return to the same type of work and actually haul extra loads means that any attempt to establish future loss of earnings would be speculative, and an award for impaired earning capacity cannot be sustained." *Id.* at 615. The court in *Krause* noted that, merely "because there has been no actual loss of wages," this "does not mean there has been no impairment of earning capacity." *Id.* The court further noted that in that case the jury "could reasonably infer that the benevolence of plaintiff's employer would not continue until retirement and he would suffer a loss in wages due to the injuries received in the accident." *Id.* at 617. ATS accurately points out that there was evidence in *Krause* that the plaintiff was working at only "half capacity" and that employer benevolence played an active role in his continued employment, and this particular evidence was not expressly available here. *See id.* at 615-16. Nevertheless, under the conceptual framework in *Krause*, the jury here was free to make an assessment based on all relevant evidence—including all evidence that could support what the circuit court characterized as a "complete[] change[]" in Hellenbrand's life due to the accident—that his earnings future was diminished by an amount in the range of what Schutz predicted.[9]

---

[9] As an afterthought at best, ATS suggests in passing a *Daubert* challenge as part of this future-earnings issue, but it fails to develop an argument supported by facts and law. We address this potential argument no further.

¶71 **Past and future pain, suffering, and disability**. ATS does not make separate arguments regarding past versus future pain, suffering, and disability, nor does ATS argue that the evidence would have supported only some particular figure below $3 million for the past and $6 million for the future. Its argument rests almost entirely on a comparison of the facts and result here to the facts and result in *Herman*. It is true of course that there are differences between the facts of *Herman* and the facts here. But we are not persuaded from anything that ATS asserts that *Herman* dictates remittitur here. As Hellenbrand points out, the ATS argument for the most part fails to engage with detailed testimony that could have allowed the jury to make findings that include the following, consistent with the circuit court's complete-life-change determination: Hellenbrand underwent brain surgery for a life-threatening injury, immediately after which he was unable to feed himself or express coherent thoughts; even as he has recovered to a degree, he has significant permanent damage to the portion of the brain that controls such fundamental, routine functions as complex thinking, memory, language, concentration, emotion, and personality; he has permanent dizziness and damage to the system that regulates a sense of balance and spatial orientation; he has permanent work restrictions and must be under supervision at work; he has cognitive fatigue and a flattening of his personality.

## CONCLUSION

¶72 For all of these reasons, we affirm the judgment of the circuit court.

*By the Court*.—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.